IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| GWENDOLYN HUGHES<br>4870 Christopher Rd.<br>Wilmer, Al. 36587<br><br>and<br><br>TIM HUGHES<br>4870 Christopher Rd.<br>Wilmer, Al. 36587<br><br>    Plaintiffs,<br><br>v.<br><br>DEPUY ORTHOPAEDICS, INC., an<br>Indiana Corporation; JOHNSON &<br>JOHNSON SERVICES, INC., a New<br>Jersey Corporation; and Does 1-10,<br><br>    Defendants. | CASE NO.  1:11-cv-00154-CG-B<br><br>JUDGE<br><br><br><br>**COMPLAINT**<br>**(Jury Demand Endorsed Hereon** |

Plaintiffs, Gwendolyn Hughes and Tim Hughes, ("Plaintiffs"), bring this Complaint against DePuy Orthopaedics, Inc. ("DePuy"), and Johnson & Johnson Services, Inc. ("Johnson & Johnson) (hereinafter collectively referred to as "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1. On August 26, 2010, Johnson & Johnson and DePuy Orthopaedics, Inc. issued a worldwide product recall of approximately 93,000 hip replacement devices that had been experiencing abnormally high rates of failure. The recall involved the ASR XL Acetabular System, a hip socket used in traditional hip replacement, and the ASR Hip Resurfacing System, a partial hip replacement that involves placing a metal cap on the ball of the femur (hereinafter collectively referred to as "Hip Replacement Devices", "Affected Products").

2. Defendants have acknowledged that thousands of patients, like Gwendolyn Hughes, have been, and/or will be, required to undergo a painful surgery to remove and replace the Hip Replacement Devices. These extensive revision surgeries have been necessitated, in part, by severe pain in the hip, groin, leg and lower back caused by component loosening, malalignment and dislocation. Patients have also experienced fractures, infections, and progressive soft tissue reactions to metal wear debris.

3. Despite knowledge that their Hip Replacement Devices were defective and resulting in the aforementioned complications, Defendants continued to aggressively market and sell the affected products, all the while maintaining that they were safe for use and effective in the treatment of hip disorders.

## THE PARTIES

4. Plaintiffs are, and at all times relevant, were residents of Brunswick, Ohio.

5. In November of 2006, Plaintiff, Gwendolyn Hughes, underwent a total hip replacement surgery for one of her hips and underwent a total hip replacement surgery for her other hip in February of 2007, employing an ASR XL Acetabular System, which was manufactured and distributed throughout the United States by the Defendants. She had a

revision for one of the total hip replacements on March 29, 2009, and had a revision the other total hip replacement on April 10, 2010.

6. Due to Mrs. Hughes's Affected Product she has suffered damage to muscles, tendons and other soft tissue as well as interference with intended bone growth.  She has also experienced pain and suffering (both past, present and future), as well as medical expenses, as a result of the two revision surgeries and has been permanently damaged.

7. Defendant DePuy is, and at all times relevant was, a corporation organized under the laws of the State of Indiana, with its headquarters and principal place of business at 700 Orthopedic Drive, Warsaw, Indiana 46581.

8. Defendant Johnson & Johnson Services, Inc. is, and at all times relevant was, a corporation organized under the laws of the State of a New Jersey with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

9. Based upon information and belief held to date, Defendant Does 1-10 were, at all times relevant, agents, employees, manufacturers, suppliers, distributors, designers, engineers, retailers, sellers, franchisees, representatives and related or affiliated entities or providers of services to or on behalf of Defendants.  On information and belief, Plaintiffs allege that Defendant Does 1-10 conspired and combined among themselves to commit the acts complained of herein.  Plaintiff does not know the true names and capacities of Defendant Does 1-10 and will seek leave to amend this Complaint to allege such names and capacities as soon as they are ascertained.  Any reference made to any defendant by specific name or otherwise, individual or plural is also a reference to the actions of Defendant Does 1-10, inclusive.

## JURISDICTION AND VENUE

10. Plaintiffs restate and re-allege each of the previous paragraphs of this Complaint as if fully rewritten.

11. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000 exclusive of interest and costs, and this is an action by an individual Plaintiff against Defendants who are each citizens of different states.

12. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

13. Plaintiffs restate and re-allege each of the previous paragraphs of this Complaint as if fully rewritten.

14. The hip joint is made up of two parts: the acetabulum, which is the socket in the hip or pelvic bone, and the femoral head, which is the ball at the top of the femur or upper leg bone.

15. The femoral head, which is the only movable part of the hip joint, is designed to glide and rotate within the socket as the hip moves. The acetabulum is immobile and remains in a fixed position.

16. Patients undergo hip replacement surgeries most commonly to address bones and cartilage that have been severely injured and/or worn down by arthritis.

17. In a total hip replacement surgery, physicians replace the femoral head with an artificial ball. This ball is attached to a femoral stem that is implanted deep into the patient's

femur. The acetabulum is then reshaped and fit with an artificial cup that allows the artificial ball to rotate smoothly.

18. Depuy's ASR XL Acetabular System was designed as a "metal-on-metal" device, where the metal ball attached to the artificial femoral stem rotates within a metal acetabular cup. The cup was designed to affix to the acetabulum through osseointegration, a process where the one grows into the porous metal cup. Depuy's ASR Hip Resurfacing System involves placing a metal cap on the patient's own femoral head. This capped ball similarly rotates within a metal acetabular cup.

19. The Affected Products first became available in July 2003. Defendants began to market the ASR XL Acetabular System in the United States in 2005.

20. Defendants represented that their Hip Replacement Devices had several advantages over other hip replacement systems. Specifically, Depuy advertised that based upon a strong clinical history, the Affected Products were less prone to dislocation and wear and more closely simulated the body's anatomy.

21. Contrary to Defendants' representations, however, the Affected Products were prone to premature failure and caused patients to experience additional pain and injury. The metal-on-metal design was capable of producing large volumes of metallic debris as the femoral head rotated and rubbed against the acetabular cup. These particles have been known to damage muscles, tendons and other soft tissue. They have also interfered with the intended bone growth into the porous shell. Many of these complications have necessitated early removal of the Affected Products and, indeed, have made replacement of the Affected Products more difficult.

22. Defendants knew or should have been aware that the Hip Replacement Devices were prone to unacceptable failure and complication rates years before warning patients of their

5

defect.  Nevertheless, Defendants continued to market and distribute the products, refusing to alert the public to the dangerous design defects.

23.     Almost five years after Defendants introduced and distributed the ASR XL Acetabular System to the United States market, they finally acknowledged the device's elevated failure rate.  In a March 15, 2010 letter, Defendant informed surgeons who had implanted the device that the "ASR platform . . . demonstrated a higher than expected revision rate . . . when used with smaller head sizes."  The letter also disclosed data compiled by the Australian National Joint Replacement Registry showing that revision rates three years after initial implantation ranged from 5.4% up to 8-9% in patients implanted with an Affected Product.  The letter further indicated that Defendants intended to stop sales of the product, purportedly due to "declining demand."

24.     In November of 2006, Plaintiff, Ms. Hughes, underwent a hip replacement surgery using the ASR XL Acetabular System and in February of 2007 underwent a hip replacement surgery for her other hip using the ASR XL Acetabular System.

25.     Thereafter, Plaintiff Gwendolyn Hughes experienced pain and discomfort in both hips.

26.     As stated above, Plaintiff Gwendolyn Hughes has undergone revision surgeries to replace the Affected Products in each hip and will require life-long medical care and other related expenses.

### FIRST CAUSE OF ACTION
**(Alabama Extended Manufacturer's Liability Doctrine)**

27.     Plaintiffs restate and re-allege each of the previous paragraphs of this Complaint as if fully rewritten.

28. At all times relevant to this action, Defendants were manufacturers and distributors, as defined by the AEMLD, which designed, produced, created, made, constructed, distributed, sold, and/or assembled the Hip Replacement Devices that were placed into the stream of commerce.

29. The Affected Products were expected to and did reach the ultimate users, including Plaintiff Gwendolyn Hughes, without substantial change in the condition they were sold.

30. The Hip Replacement Devices manufactured, designed, sold, distributed, supplied, promoted and/or placed into the stream of commerce by Defendants were defective in that: it was susceptible to causing injury and lacked adequate safety features to prevent users such as Plaintiff Gwendolyn Hughes from being injured.

31. Specifically, Defendants' failures include, but are not limited to:

   a. Defendants' failure to exercise reasonable care in the manufacture, design and testing of the Hip Replacement Devices;

   b. Defendants' failure to include adequate warnings that would alert the medical and/or scientific communities and users of the Hip Replacement Devices, including Plaintiff, of the substantially increased risk and serious side effects of the Affected Products;

   c. Defendants' failure to adequately and improperly test and inspect the Hip Replacement Devices before placing the medical devices on the market and distributing them into the stream of commerce;

   d. Defendants' failure to conduct sufficient testing and inspection of the Hip Replacement Devices which, if properly performed, would have shown that the medical devices had serious increased side effects;

   e. Defendants' failure to adequately warn the medical and/or scientific communities and users of the Hip Replacement Devices, including Plaintiff, of the potential risks and other serious side effects associated with the medical devices;

      f.    Defendants' failure to provide adequate post-marketing warnings or instructions after Defendants knew or should have known of the significant risks associated with the use of the Hip Replacement Devices;

      g.    Defendants' failure to timely and appropriately recall and/or remove the Hip Replacement Devices from the stream of commerce when they knew or should have known of the defective and unreasonably dangerous nature of the medical devices; and

      h.    Defendants' encouragement of misuse and overuse while failing to disclose the side effects of the medical device to the medical and/or scientific communities, and users, including Plaintiff, in order to maximize profit from sales.

32. The Hip Replacement Devices were unsafe for normal or reasonably anticipated use.

33. Plaintiff Gwendolyn Hughes was using the ASR XL Acetabular Systems in the manner for which they were intended and/or in a reasonably foreseeable manner.

34. Plaintiff Gwendolyn Hughes could not, through the exercise of reasonable care, have discovered the defects or perceived the dangers posed by the medical device.

35. As a direct and proximate result of this defective product, Plaintiff Gwendolyn Hughes sustained serious side effects including, but not limited to, Acetabular Cup detachment, disconnection, creation of metallic debris and/or loosening, pain, disability, unnecessary and additional surgeries, and other injuries presently undiagnosed.

36. As a further direct and proximate result of the foregoing, Plaintiff Gwendolyn Hughes suffered severe and permanent injuries, as well as disability.

37. As a further direct and proximate result of Defendants' conduct, as described above, Plaintiff Gwendolyn Hughes incurred medical and other related expenses.

38. As a further direct and proximate result of Defendants' conduct, as described above, Plaintiff Gwendolyn Hughes has incurred lost wages and suffered a permanent diminution in earning capacity.

39. As a further direct and proximate result of Defendants' conduct, as described above, Plaintiff Gwendolyn Hughes has incurred, and will continue to incur, medical, hospital and other related expenses.

40. As a further direct and proximate result of Defendants' conduct, as described above, Plaintiff Gwendolyn Hughes has experienced, and will continue to experience, great physical pain, suffering and emotional distress.

41. As a further direct and proximate result of Defendants conduct, as described above, Plaintiff Gwendolyn Hughes has suffered, and continues to suffer, a loss of enjoyment of life.

42. As a further direct and proximate result of Defendants conduct, Plaintiff Gwendolyn Hughes has suffered a permanent injury, which will require life-long medical care and other related expenses.

## SECOND CAUSE OF ACTION
### (Negligence– Design, Manufacture and Sale)

43. Plaintiffs restate and re-allege each of the previous paragraphs of this Complaint as if fully rewritten.

44. Prior to, on, and after the dates of Plaintiff Gwendolyn Hughes's initial hip replacement surgery, and at all relevant times, Defendants designed, tested, distributed, manufactured, advertised, sold, and marketed the Hip Replacement Devices and, specifically, the ASR XL Acetabular System, for implantation into consumers, such as Plaintiff Gwendolyn

Hughes, by physicians and surgeons in the United States, including in the City of Mobile, Alabama and Mobile County, Alabama.

45. Prior to, on, and after the dates of Plaintiff Gwendolyn Hughes's initial hip replacement surgery, the Defendants were negligent and careless in and about their design, testing, distribution, manufacture, advertising, sales and marketing of the above-described Affected Products.

46. Prior to, on, and after the dates of Plaintiff Gwendolyn Hughes's initial hip replacement surgery, the Defendants performed inadequate evaluation and testing of the Hip Replacement Devices where such evaluation and testing would have revealed the propensity of the Devices' acetabular cup to detach, disconnect, create metallic debris and/or loosen from the acetabulum, and to cause pain, inhibition of the ability to walk, and require revision surgery.

47. Prior to, on, and after the dates of Plaintiff Gwendolyn Hughes's initial hip replacement surgery, the Defendants had received complaints from healthcare providers that the Hip Replacement Devices caused serious complications including detachment, disconnection, creation of metallic debris and/or loosening of the acetabular cup from the acetabulum.

48. Defendants had a duty to and breached their duty to perform further testing of the Hip Replacement Devices; investigate the root cause of these complications; suspend sales and distribution; or warn physicians and patients of the propensity of the devices' acetabular cup to detach, disconnect, create metallic debris and/or loosen from the acetabulum.

49. As a direct and proximate result of the above-described negligence in design, testing, distribution, manufacture, advertising, sales and marketing, Plaintiff Gwendolyn Hughes suffered the aforementioned injuries.

50. Defendants' negligence in design, testing, distribution, manufacture, advertising, sales, and marketing prior to, on, and after the dates of Plaintiff Gwendolyn Hughes's initial hip replacement surgery was a substantial factor in causing Plaintiff Gwendolyn Hughes's injuries and damages, as described herein.

### THIRD CAUSE OF ACTION
**(Negligence– Failure To Recall/Retrofit)**

51. Plaintiffs restate and re-allege each of the previous paragraphs of this Complaint as if fully rewritten herein

52. Prior to, on, and after the date of Plaintiff Gwendolyn Hughes's initial hip replacement surgeries, and at all relevant times, Defendants designed, distributed, manufactured, sold, and marketed the Hip Replacement Devices and, specifically, the ASR XL Acetabular System, for implantation into consumers, such as Plaintiff Gwendolyn Hughes, by physicians and surgeons in the United States, including in the City of Mobile, Alabama and County of Mobile.

53. Prior to, on, and after the dates of Plaintiff Gwendolyn Hughes's initial hip replacement surgeries, Defendants knew or reasonably should have known that the Hip Replacement Devices were dangerous or were likely to be dangerous when used in a reasonably foreseeable manner.

54. Prior to, on, and after the dates of Plaintiff Gwendolyn Hughes's initial hip replacement surgeries, which was after the ASR XL Acetabular System was initially sold in the United States market, Defendants became aware of the defects in the Hip Replacement Devices including the propensity of their acetabular cup to detach, disconnect, create metallic debris and/or loosen from the acetabulum.

55. Defendants failed to timely and appropriately recall, retrofit, or warn Plaintiff Gwendolyn Hughes or physicians about the danger of the devices prior to, on, and after the dates of Plaintiff Gwendolyn Hughes's initial hip replacement surgeries.

56. In light of the severity and amount of complaints transmitted to Defendants and the additional available data, reasonable manufacturers and distributors under the same or similar circumstances would have recalled or retrofitted the Affected Products prior to August 26, 2010.

57. As a direct and proximate result of the above-described negligent failure to recall or retrofit, Plaintiff Gwendolyn Hughes suffered the injuries herein described.

58. Defendants' negligent failure to timely and appropriately recall or retrofit the Hip Replacement Devices and their warnings prior to, on, or after the dates of Plaintiff Gwendolyn Hughes's initial hip replacement surgeries was a substantial factor in causing Plaintiff Gwendolyn Hughes's injuries and damages, as described herein.

## FOURTH CAUSE OF ACTION
**(Fraudulent Misrepresentation)**

59. Plaintiffs restate and re-allege each of the previous paragraphs of this Complaint as if fully rewritten herein

60. Defendants, having undertaken the manufacturing, marketing, dispensing, distribution and promotion of the Hip Replacement Devices, owed a duty not to deceive Plaintiff Gwendolyn Hughes, health care providers and the public regarding the character, safety, quality and/or effectiveness of their medical devices.

61. The duty not to deceive is distinct from the duty to warn.

62. Since the Affected Products entered the market, Defendants fraudulently misrepresented and published information in various forms regarding their character, safety, quality and/or effectiveness.

63. At the time of Defendants' fraudulent misrepresentations, Plaintiff Gwendolyn Hughes and/or her medical providers were unaware and ignorant of the falsity of the statements and reasonably relied upon them to be true.

64. Defendants breached their duties to Plaintiff Gwendolyn Hughes by providing false, incomplete and misleading information regarding the Affected Products and, specifically, ASR XL Acetabular System.

65. Defendants acted with deliberate intent to deceive and mislead Plaintiff Gwendolyn Hughes, her medical providers, and the public.

66. Plaintiff Gwendolyn Hughes directly and/or indirectly reasonably relied upon Defendants' deceptive, inaccurate and fraudulent misrepresentations.

67. As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff Gwendolyn Hughes sustained the injuries and damages heretofore alleged.

68. Defendants' conduct was malicious and a deliberate disregard for the rights and safety of others, including Plaintiff Gwendolyn Hughes, thereby entitling Plaintiff Gwendolyn Hughes to punitive damages so as to punish Defendants and deter them from similar conduct in the future.

### FIFTH CAUSE OF ACTION
(Loss of Consortium)

69. Plaintiff Tim Hughes, Husband of Plaintiff Gwendolyn Hughes, incorporates herein by reference all of the statements and allegations made and contained in Counts I-VII as if the same were fully rewritten herein.

70. By reasons of the foregoing, Plaintiff Tim Hughes lost the services, companionship and consortium of his wife and he will lose the services, companionship and consortium of his wife in the indefinite future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against the Defendants, individually and collectively, jointly and severally, as follows:

    a.    For an award of compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00);

    b.    For an award of punitive or exemplary damages against Defendants in excess of Seventy-Five Thousand Dollars ($75,000.00);

    c.    For reasonable attorney fees and costs;

    d.    For pre-judgment interest; and

    e.    For such further and other relief this Court deems just and equitable.

Respectfully submitted,

/s/ Peter S. Mackey
PETER S. MACKEY (MACKP4325)

**OF COUNSEL:**
**Burns, Cunningham & Mackey, P.C.**
**PO Box 1583**
**Mobile, Alabama  36633**
**Phone: (251) 432-0612**
**Facsimile: (251) 432-0625**

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable with the maximum number of jurors permitted by law.

/s/ Peter S. Mackey